**IN THE UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF OHIO**

**EASTERN DIVISION**

| | | |
|---|---|---|
| SHEILA BROKENSHIRE, | ) | CASE NO. 3:21-CV-01816-JRK |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES R. KNEPP, II |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JENNIFER DOWDELL ARMSTRONG |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Defendant, | ) | |

## I.    INTRODUCTION

Plaintiff Sheila Brokenshire ("Ms. Brokenshire") seeks judicial review of the final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits ("DIB"). (ECF Doc. 1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). Pursuant to Local Civil Rule 72.2, this matter was referred to a magistrate judge for preparation of a Report and Recommendation, and was subsequently reassigned to me pursuant to General Order No. 2022-14 on September 2, 2022. For the reasons set for the below, I RECOMMEND that the Court AFFIRM the final decision of the Commissioner.

## II.    PROCEDURAL HISTORY

On March 4, 2019, Ms. Brokenshire filed an application for DIB, alleging a disability onset date of December 14, 2018. (Tr. 214).[1] Her application was denied initially on July 9, 2019, and

---

[1] The transcript referred to in this Report and Recommendation can be located at ECF Doc. 5 on CM/ECF.

upon reconsideration on February 24, 2020, and Ms. Brokenshire requested a hearing before an administrative law judge ("ALJ"). (Tr. 24). On September 3, 2020, an ALJ held a hearing, during which Ms. Brokenshire, represented by counsel, and an impartial vocational expert testified. (Tr. 68-91). On October 22, 2020, the ALJ issued a written decision finding Ms. Brokenshire was not disabled. (Tr. 24-41). The ALJ's decision became final on July 23, 2021, when the Appeals Council declined further review. (Tr. 1). Ms. Brokenshire asserts the following assignments of error:[2]

1. The ALJ applied an incorrect legal standard when evaluating the functional capacity evaluation done by Mr. Reed.

2. The ALJ's decision should be reversed and remanded because the ALJ did not have the authority to hear and ultimately make a decision in this case.

(ECF Doc. 7, PageID#1425).

On April 28, 2022, Ms. Brokenshire filed a Notice of Withdrawal of Issue, stating that she was withdrawing her second assignment of error (the separation of powers argument). (ECF Doc. 11, PageID#1474). Because Ms. Brokenshire has withdrawn her second assignment of error, the only assignment of error that will be addressed in this Report and Recommendation is whether the ALJ properly evaluated the opinion of Mr. Reed, Ms. Brokenshire's physical therapist.

## III.    BACKGROUND INFORMATION

### A.  *Personal, Educational, and Vocational Experience*

Ms. Brokenshire was born in January 1968, and she was 50 years old on the alleged onset date. (Tr. 39). She is married and has adult children that no longer reside in her household. (Tr. 58). At the time of the hearing, Ms. Brokenshire testified that she had a driver's license, and her

---

[2] Ms. Brokenshire's assignments of error in her merits brief are set forth verbatim herein, including certain typographical and/or grammatical errors.

only restriction on the license was for corrective lenses. (*Id.*). She has worked as a registered nurse, hospital administrator, nurse instructor, and nurse supervisor. (*See* Tr. 60-61).

### B.  *Relevant Hearing Testimony*

#### 1. <u>Ms. Brokenshire's Testimony</u>

The ALJ summarized Ms. Brokenshire's hearing testimony as follows:

At hearing, the claimant testified that she has a valid driver's license and has no restrictions on her license other than for corrective lenses. She testified that one of the major issues that prevents her from working is her eyesight. Specifically, she testified that she has fallen when walking and not looking down, as she is not able to see things on the ground. Sometimes she looks and sees something and other times she is unable to see that item. The claimant testified that she was driving regularly until February 2017, but she has not driven since 2017. She is able to read some, although the words will disappear and she has to read things over to make sure she understands what she is reading. She is able to watch television and see enough that she is able to follow along. She has a large computer screen so that she can enlarge the font. Her peripheral vision is good. The claimant testified that she has episodes of sharp eye pain when moving her eyes. She has experienced this pain since 2012, and it occurs every three to four months. During these times, she experiences extremely blurred vision. When this occurs, she is prescribed Prednisone. She testified that she was on Prednisone from August 2019 through March 2020. When she was on the Prednisone she had extensive swelling and had to elevate her legs. The claimant testified that she has daily severe headaches due to her vision problems, for which she takes Excedrin Migraine. If the headaches are severe, she has associated nausea and vomiting. The claimant does not go out at night because she is afraid of falling. In addition to her vision problems, the claimant testified that she has a lot of muscle weakness, fatigue and pain in her upper arms, lower legs and back. She further alleged that she has carpal tunnel bilaterally and has ongoing numbness and she drops things. She testified she has to be careful using a knife or other sharp instrument. The claimant stated that she is unable to sit for longer than ten minutes, walk for longer than ten minutes, or stand for more than ten minutes in one spot. She has to walk around and lean over things to rest. She does not lift more than 10 pounds. However, she is able to lift a gallon of milk in each hand. The claimant testified that she does not sleep well because of her back pain. Some days, she is unable to stand long enough to shower and on those days she uses a shower chair. She is able to load and unload the dishwasher but is unable to lift clothes baskets. On a good day, she is able to put clothes in the washing machine. Her son usually comes in the afternoon when her husband leaves for work to make sure everything is ok and she is able to get something to eat. However, she is able to prepare a simple meal. The claimant is able to dress herself, although she sometimes has trouble with fasteners. She takes pain medication and uses a pain patch. When her pain is most severe, the pain patch reduces her pain

level to a 9/10. The claimant takes Adderall for ADHD. She has not seen a mental health professional since 2015. The claimant further testified that in December 2019 she started having urinary frequency and incontinency. These symptoms have worsened since that time, such that she needs to empty her bladder every two hours. She wears a pad to help with urinary incontinence. The claimant testified that she has issues with memory, concentrating, and trying to find a word when communicating (Hrg. Tr.).

(Tr. 31).

## 2. <u>Vocational Expert's Testimony</u>

The ALJ asked the vocational expert ("VE") to consider a person with Ms. Brokenshire's age, education, and vocational background who could perform at the light exertional level with the limitations of occasionally climbing ramps and stairs; never climbing ladders, ropes, or scaffolds; frequently stooping, kneeling, crouching, and crawling; frequently reaching overhead with the bilateral upper extremities; frequently handling, fingering, and feeling with bilateral upper extremities; must be permitted to wear dark glasses when working in bright sunlight or under fluorescent lights; can never be exposed to hazards; may never drive commercially; and is limited to reading print that is no smaller than ordinary newspaper print, and using computers or machinery that permit the user to enlarge test. (Tr. 82). The VE opined that the individual could perform her past relevant work as a hospital administrator, director of nursing services, and a nursing instructor, but she would not be able to perform work as a nurse supervisor. (Tr. 83-84). The VE further opined that the individual could perform the other following jobs: sales attendant and office helper. (Tr. 84).

As a second hypothetical, the ALJ asked the VE whether a person with Ms. Brokenshire's age, education, and vocational background with the same limitations as the first hypothetical and the additional limitation of frequent unscheduled restroom breaks throughout the day due to urinary incontinence would be precluded from work. (Tr. 85). The VE opined that this would

eliminate all the jobs previously provided by the VE and preclude competitive employment. (Tr. 86).

### C. *Relevant Medical/Non-Medical Opinion Evidence*

#### 1. <u>State Agency Medical Consultants</u>

##### a. **William Bolz, M.D.**

Dr. Bolz found that Ms. Brokenshire could lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for about six hours in an eight-hour workday; occasionally climb ladders/ropes/scaffolds; frequently stoop, kneel, crouch, or crawl; frequently reach overhead bilaterally; and frequently handle bilaterally. (Tr. 99-101).

##### b. **Abraham Mikalov, M.D.**

Dr. Mikalov affirmed Dr. Bolz's findings regarding exertional, postural, and manipulative limitations. (Tr. 122-26). He additionally opined that Ms. Brokenshire should avoid unprotected heights, commercial driving, and all exposure to hazards due to congenital anomaly of the optic nerve, estropia, and optic atrophy, and optic neuritis. (Tr. 124-25).

#### 2. <u>David Reed, PT, DPT, MS, MBA</u>

Mr. David Reed, a physical therapist, conducted a functional capacity evaluation for Ms. Brokenshire on January 23, 2019. (Tr. 522-26). After the one-time evaluation, Mr. Reed opined that Ms. Brokenshire could do the following: (1) lift no more than 15 pounds on a non-repetitive basis; (2) stand and walk no more than a combined two hours in an eight-hour workday and for no more than 15 to 20 minutes at a time; (3) sit for no more than 20 minutes at a time; (4) never bend, crawl, or climb ladders, rarely squat or climb stairs; (5) occasionally reach up or out; and (6) occasionally use her hands but not for repetitive movements. (*Id.*). He wrote that Ms. Brokenshire reported increased pain with increased activity level, and he recommended no repetitive

activities/tasks and that Ms. Brokenshire follow up with her physician regarding medical recommendations/options. (Tr. 523). The functional capacity evaluation also revealed that Ms. Brokenshire's cervical range of motion was within functional limits in all directions; her trunk/low back area range of motion is limited 25% in all directions due to Ms. Brokenshire's report of increased pain; her bilateral upper extremity range of motion was within functional limitations; Ms. Brokenshire reported pain in her left shoulder/upper extremity at end range of motion; and her bilateral lower extremity range of motion was within functional limits. (*Id.*).

     **D.** *Relevant Medical Evidence*

In this proceeding, Ms. Brokenshire primarily challenges the ALJ's findings with respect to the persuasiveness of her physical therapist's opinion regarding her functional capacity. (ECF Doc.7, PageID#1429-31). The ALJ summarized Ms. Brokenshire's health records and symptoms related to these issues as follows:

> The claimant filed for disability benefits, alleging an inability to work due to blindness or low vision, lower back and leg pain and weakness, decreased strength, optic neuritis, extreme fatigue, optic atrophy, congenital anomaly optic nerve bilaterally, and an inability to sit, stand, or lay for any length of time (Ex. 1E, p. 2). On appeal, the claimant alleged a worsening of her conditions, specifically noting a frozen left shoulder and a new diagnosis of neuromyelitis optica and/or anti MOG (Ex. 5E, p. 2). In an adult function report, the claimant alleged vision difficulties with related headaches, pain and numbness in her extremities and back, and extreme fatigue (Ex. 9E, p. 4). She alleged her impairments affect her sleep and that she has some difficulty with her personal care. She stated she does grocery shopping online and her husband picks up the groceries. The claimant alleged difficulty with standing, walking, sitting, stair climbing and all postural activities. She further alleged difficulty with seeing, memory, completing tasks, concentrating, using her hands, and understanding and following instructions (Ex. 9E, p. 9). The claimant submitted an additional statement describing additional treatment and symptoms, including a recent surgery on her left hand for carpal tunnel and left elbow to release the ulnar nerve (Ex. 21E). The claimant's representative submitted a prehearing brief summarizing her impairments and treatment (Ex. 23E).
> …

The evidence includes objective test results and treatment notes dated prior to the claimant's alleged onset date (Exs. 1F & portions of 2F, 3F, 4F, 5F, 110F, 14F, 16F, & 17F). While considered, the evidence does not provide pertinent information regarding the claimant's residual functional capacity as of December 14, 2018. Therefore, a detailed analysis of the evidence dated prior to December 14, 2018 is unwarranted. Nevertheless, the undersigned has considered all evidence in the record and notes that the residual functional capacity above accommodates all limitations supported by the medical record as a whole for the time period in question. Specifically, the undersigned has considered the claimant's history of low back pain for which she has had two surgeries, most recently in 2017. The claimant was referred to pain management in September 2018 for reports of back and left leg pain (Ex. 3F, p. 9). A recommendation for an epidural injection was made and she was prescribed Norco (Ex. 3F, p. 13). Cervical and lumbar x-rays taken in October 2018 showed no fracture or spondylolisthesis (Ex. 4F, pp. 45-47). The record also contains an EMG/NCS study from September 13, 2017 showing severe right carpal tunnel syndrome and mild left carpal tunnel syndrome, for which the claimant underwent right carpal tunnel release surgery in 2017 (Ex. 17F, pp. 4 & 10). A June 2018 nerve conduction study of the bilateral upper extremities showed evidence consistent with an ulnar neuropathy across the elbow on the left, chronic right C6-7 cervical radiculopathy, chronic left C5-6 cervical radiculopathy and residual right median neuropathy across the wrist (Ex. 18F, p. 27). The record also includes a visit with neurology on November 5, 2018, at which time the claimant reported worsening vision and diffuse body aching. However, a recent MRI of the brain was reviewed as showing no evidence of demyelination (Ex. 2F, p. 36). Finally, the undersigned notes that the record also shows a diagnosis of ADHD, with which the claimant has done well with prescribed medication (Ex. 4F, p. 11).

With respect to her musculoskeletal complaints, on December 7, 2018, the claimant underwent transforaminal lumbar epidural steroid injections at L5 and S1 on the left (Ex. 14F, pp. 50-51). At a follow-up with pain management on December 13, 2018, she reported that the previously prescribed Norco was not helping much. Her musculoskeletal examination revealed tenderness but no edema, and she had decreased lumbar range of motion and tenderness. She was prescribed Lyrica (Ex. 3F, pp. 31-33). With respect to her vision impairments and treatment for MS, the claimant has consulted and treated with several providers across multiple specialties. Although the claimant testified that she has not driven since 2017, she reported to her eye specialist at a January 2019 follow-up that she was having increasing difficulty distinguishing between whites and greys, giving the example that, "If I'm driving, I have most trouble with white cars." She stated when driving through an intersection she would look more than any other person to make sure that there was not a grey or white car approaching (Ex. 2F, p. 29). She continued to report daily headaches. However, on examination, there was no objective change in vision (Ex. 2F, pp. 30-35). On January 23, 2019, the claimant underwent a functional capacity evaluation. Her cervical range of motion was within functional limits in all directions, her trunk/low back range of motion was limited 25% in all directions due to pain, bilateral upper extremity range of motion was within

7

functional limits, but she reported increased pain in the left upper extremity at the end of range of motion. Bilateral lower extremity range of motion was within functional limits. The claimant demonstrated the ability to lift up to 15 pounds, sit constantly for up to 20 minutes at a time, stand occasionally for up to 20 minutes at a time, and walk occasionally. Combined ability to stand and walk were estimated to be no more than 2 hours in an eight-hour workday, with a recommendation that she be permitted to change positions between standing, sitting and walking as needed. The claimant demonstrated a rare ability to squat, occasional ability to reach up and out, no ability to bend or crawl, a rare ability to climb stairs, no ability to climb ladders and occasional use of her hands. Right pinch was 15 pounds and left pinch 12 pounds. She had right grip strength of 44 pounds and left of 25 pounds (Ex. 4F, pp. 37-41). However, at a February 4, 2019 follow-up with neurology, her musculoskeletal examination showed no hand arthritis, no limitation of range of motion in any of her extremities and no lower extremity edema. Her neurological examination was also normal. The claimant was advised to pursue testing previously scheduled by neuro ophthalmology (Ex. 3F, pp. 43-44). At a pain management follow-up visit the following day, the claimant reported that she received about 70% relief for a few days. She was scheduled for a second series of injections at the same levels. Her insurance had not covered the previously prescribed Lyrica and she was given a 15-day trial of Lyrica (Ex. 3F, pp. 55-58). At a May 29, 2019 follow-up with her primary care provider, the claimant reported she was sleeping well at night. She reported she had fallen that day due to vision difficulties and not seeing an object on the floor. However, on examination, she had a normal gait, normal strength, and no atrophy or abnormal movements were noted. She was continued on a pain patch and Tramadol (Ex. 19F, pp. 1-2). The record shows that as of June 2019, with best correction, the claimant had 20/20 distance vision in her right eye and 20/25 in her left (Ex. 2F, p 3). The claimant followed up with neurology on June 15, 2019 for optic neuritis and body aches (Ex. 15F, p. 19). She continued to report blurred vision in her left eye but denied any new symptoms (Ex. 15F, p. 19). A June 11, 2019 brain MRI was reviewed as stable (Ex. 15F, p. 23). She was referred to neurology "at higher level of care" and advised to follow through with her appointment with neuroopthalmology at OSU (Ex. 15F, p. 23). On July 12, 2019, the claimant was evaluated by a neuroscience specialist at OhioHealth Multiple Sclerosis Center. The specialist evaluated recent imaging as unremarkable, though incomplete. Additional imaging was ordered and the provider noted he would obtain prior testing. Physical therapy met with her that day to evaluate and make recommendations for therapy, and it was strongly recommended the participate in an exercise program (Ex. 6F, pp. 9 & 15).

On August 2, 2019, the claimant followed-up with the Havener Eye Institute at Ohio State University, reporting that her vision was slowly getting worse, although her headaches were stable with Excedrin. Her examination showed no change in the right eye as compared with six months ago centrally, but there was new light depression of the inferior periphery. Examination of her left eye remained stable compared with six months prior. It was recommended she be prescribed Rituximab but until that was accomplished, she was started on 20 mg Prednisone (Ex. 19F, pp.

71-72 & 84). The claimant returned to her neuro-immunologist later that month for an urgent follow-up with reports of worsening eye pain and vision. Specifically, she reported new neurological symptoms, including blurry vision and pain with eye movement in her right eye. However, the claimant reported that her eye specialist had recently increased her dose of Prednisone, which improved her pain with eye movement. Her corrected visual acuity was 20/70 in the right eye and 20/50 in the left eye. Her tandem gait was only mildly impaired, and laboratory workup was negative. Further diagnostic testing revealed worsening optic atrophy and VF loss in the right eye. Her presentation was consistent with recurrent optic neuritis and plans to repeat antibody testing were made. Additional imaging was planned and she was to continue her dose of 60 mg Prednisone until she was started on steroid-sparing therapy. Her first dose of steroids was done in the infusion center that day followed by four days of high-dose oral steroids (Ex. 6F, pp. 25-30). At a follow-up with her eye specialist on October 4, 2019, the claimant reported only slight improvement in her vision since taking prednisone, but that the eye pain was gone. Her examination showed a progression of the right eye's inferior hemifield defect; her dose of Prednisone was increased to 80 mg. (Ex. 8F, pp. 3-6).

On October 22, 2019 the claimant had a MRI of the thoracic spine that showed no convincing intramedullary signal abnormality and mild to moderate degenerative disc disease in the mid to lower thoracic spine with several small disc herniations but no levels of high-grade spinal stenosis or cord compression (Ex. 21F, p. 12). A cervical MRI that date showed no convincing intramedullary lesions but a C5-6 left paracentral disc protrusion resulting in severe spinal canal stenosis with mild flattening of the left ventral aspect of the cervical cord (Ex. 21F, p. 22). She was seen that date at the Ohio Health MS Center and started on Rituximab for long term prevention of recurrent optic neuritis, with a plan to taper her current 80 mg dose of prednisone upon receiving Rituximab. For her current optic neuritis, it was recommended a course of Plasmapheresis. However, the claimant was concerned about being admitted given she provided care for her mother and stated she would follow-up to let the provider know if she wished to do this as an outpatient. (Ex. 19F, pp. 45-56). She was seen in follow-up by her neuroscience specialist the following day who reviewed the MRIs as unremarkable and noted serum work-up was negative. He also recommended a course of plasmapheresis to improve current visual recovery (Ex. 9F, pp. 7-11). The record indicates that it was planned that the claimant would have plasmapheresis as an outpatient but that she had new bilateral hand numbness and was sent by her provider for direct hospital admission on November 15, 2019. The admitting document notes complaints of bilateral hand numbness due to suspected MS flare and that she would be admitted for initiation of plasmapheresis (Ex. 21F, p. 37 & 62). An MRI of the brain showed multiple small periventricular and justacortical white matter T2/FLAIR hyperintense lesions consistent with the claimant's known history of MS. Compared to her prior MRI of June 7, 2019, there were possible new punctate lesions seen; however, these findings were felt possibly due to difference in imaging technique. There was no evidence suggesting active demyelinating disease and no acute findings (Ex. 21F, p. 122-123). A cervical MRI showed no abnormal spinal cord signal nor evidence

9

of active demyelinating disease, and unchanged degenerative changes of the cervical spine notably at C5-6 (Ex. 21F, p. 123). During the admission, the claimant received PLEX treatment that was completed on November 25, with some improvement in her hand paresthesias. She was discharged with instructions to continue Prednisone and follow-up as an outpatient (Ex. 21F, p. 94).

Due to other symptoms, the claimant was delayed in starting Rituximab (Ex. 20F, p. 24).

On January 28, 2020, the claimant underwent a consultative ophthalmology examination by Jeffrey Unterbrink, O.D. (Ex. 13F). Her examination revealed best corrected distance vision of 20/40 in the right eye, 20/25 in the left eye and best corrected reading vision of 20/40 in the right eye and 20/25 in the left eye (Ex. 13F, p. 2). On February 12, 2020, the claimant's ophthalmologist prescribed new eyeglasses (Ex. 22F).

At a June 16, 2020 follow-up visit at the Mellen Center for MS, the claimant reported feeling worse since starting Rituxan and having a recurrent event after one cycle so it was discontinued. Vision testing showed visual acuity correctable to 20/20 in the right eye and 20/60 in the left eye. She had bilateral dyschromatopsia and no afferent pupillary defect (Ex. 23F, p. 59). Humphrey visual fields showed inferior altitudinal defects sparing the temporal region in both eyes; the right optic nerve was flat with superior pallor; the left nerve was edematous with superior pallor. Her neurological examination showed findings consistent with proximal myopathy, most likely steroid induced, and lumbar radiculopathy but no findings that would explain her left side sensory disturbance or intermittent bladder incontinence (Ex. 23F, p. 68). Repeat imaging was planned and consideration was given to switching Rituxan. Blood work and a bone density scan were ordered to determine baseline (Ex. 23F, pp. 59-69).

At a pain management follow-up visit on July 8, 2020, the claimant reported back pain at a 9/10, and a functional capacity limitation of 5-6/10. On examination, she had lower extremity bilateral pedal edema but no pitting edema. She had a negative seated straight leg raise bilaterally. Supine straight leg raise on the right was equivocal and negative on the left. Cross leg reflex testing on the right was equivocal and negative on the left. She had a positive compression test and severe tenderness over bilateral L3-S1 facet areas.SI dysfunction was noted bilaterally with moderate to severe tenderness over the bilateral SI joint areas. The claimant had severe tenderness over the sacrococcygeal ligament area and decreased range of motion in all planes of lumbar spine movement. It was recommended she have further injections (Ex. 18F, pp. 4-5).

A July 23, 2020 cervical MRI showed mild scoliosis, associated multilevel spondylosis most significantly at C5-6, a C5-6 disc protrusion/herniation with mild cord impingement, mild to moderate spinal canal stenosis, and mild to moderate acquired left foraminal stenosis (Ex. 17F, p. 25). A July 23, 2020 MRI of the brain

showed stable minor nonspecific cerebral white matter changes not typical for a demyelinating disease (Ex. 17F, p. 28). A July 30, 2020 lumbar MRI showed multilevel degenerative changes, including disc herniations, causing canal, subarticular, and foraminal stenosis with nerve root contact (Ex. 17F, p. 19). A thoracic MRI that date showed multilevel degenerative changes, most notably at T7-8 and T9-10 similar to an October 2019 MRI (Ex. 17F, p. 22).

(Tr. 30-36).

## IV.    THE ALJ'S DECISION

In his October 22, 2020 decision, the ALJ made the following findings:[3]

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2022.

2. The claimant has not engaged in substantial gainful activity since December 14, 2018, the alleged onset date (20 CFR 404.1571 *et seq*.).

3. The claimant has the following severe impairments: degenerative disc disease of the cervical and thoracic spine; multiple sclerosis; status post lumbar fusion; congenital anomaly of the optic nerve; recurrent optic neuritis; esotropia; neuromyelitis optica; and, bilateral carpal tunnel syndrome. (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) with the following limitations: occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently stoop, kneel, crouch, and crawl; frequently reach overhead with the bilateral upper extremities; and, frequently handle, finger, and feel with the bilateral upper extremities. She must be permitted to dark glasses when working in bright sunlight or under fluorescent lighting; and can never be exposed to hazards such as moving machinery, unprotected heights, and sharp objects or tools such as knives. She may never drive commercially and is limited to reading print that is no smaller than ordinary newspaper print and using computers or machinery that permit the user to enlarge text.

6. The claimant is capable of performing past relevant work as a Hospital Administrator DOT #187.117-010, skilled with an SVP of 8, classified at the light exertional level per the DOT but performed at the very heavy exertional level; Director, Nursing services DOT

---

[3] The ALJ's findings are summarized.

#075.117-022, skilled with an SVP of 8, classified at the sedentary exertional level per the DOT but performed at the very heavy exertional level; and, a Nurse Instructor DOT #075.124-018, skilled with an SVP of 8, classified at the light exertional level per the DOT but performed at the heavy exertional level. The claimant is able to perform this work, within the limitations set forth in the above residual functional capacity assessment, as generally performed in the national economy, but not as actually performed.

7. The claimant has not been under a disability, as defined in the Social Security Act, from December 14, 2018, through the date of this decision (20 CFR 404.1520(f)).

(Tr. 26-41).

## V.     LAW AND ANALYSIS

### A.  *Standard of Review*

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently[.]" *Cutlip* at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059-60 (6th Cir. 1983).

In addition to considering whether the Commissioner's decision was supported by

substantial evidence, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner follow its own regulations is grounds for reversal if the error prejudices a claimant on the merits or deprives the claimant of a substantial right. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original)).

### B. *Standard for Disability*

The Social Security regulations outline a five-step sequential evaluation process that the ALJ must use in determining whether a claimant is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step

Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.*

### C.  *Persuasiveness of Opinions (Step Four)*

At Step Four of the sequential evaluation, the ALJ must determine a claimant's RFC after considering all the medical and other evidence in the record. 20 C.F.R. § 404.1520(e). In doing so, the ALJ is required to "articulate how she considered the medical opinions and prior administrative medical findings." 20 C.F.R. § 404.1520c(a). At a minimum, the ALJ must explain how he considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2).

According to the regulation, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be. 20 C.F.R. § 404.1520c(c)(2).  This is the consistency standard. And the regulation specifies that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinion will be. This is the supportability standard. *See* 20 C.F.R. § 404.1520(c)(1).

### D.  *Evaluation of Mr. Reed's Opinion*

#### 1. <u>Parties' Arguments</u>

##### a.  **Ms. Brokenshire's Arguments**

Ms. Brokenshire contends that the ALJ did not comply with Social Security regulations in evaluating Mr. Reed's opinion because the ALJ cited to 20 C.F.R. § 404.1527, an outdated regulation, rather than 20 C.F.R. § 404.1520c (2017), the regulation currently in effect. (ECF Doc. 7, PageID#1429-30). According to Ms. Brokenshire, the ALJ applied an incorrect legal standard that necessitates a remand. (*Id.* at 1430). She further argues that the ALJ's alleged application of

an incorrect legal standard "prejudiced" her disability claim. (*Id.*). Specifically, the ALJ classified Mr. Reed as an "other source" and explained that Mr. Reed was not an acceptable medical source. (*Id.* (citing Tr. 37)). Thus, Ms. Brokenshire argues that by "simply applying the incorrect legal standard," the ALJ, "without even considering Mr. Reed's opinions, diminished the value of his findings." (*Id.* at 1430-31).

Ms. Brokenshire asserts that under the appropriate regulation, the ALJ was required to consider whether Mr. Reed's opinions were consistent with the record and whether they were supported by the record. (*Id.* at 1431). Here, Ms. Brokenshire contends that the ALJ failed to do so. (*Id.*). Ms. Brokenshire further argues that Mr. Reed's opinions were supported by the fact that Mr. Reed performed a functional capacity evaluation that allowed him to observe Ms. Brokenshire physically attempt various tests. (*Id.*) These objective tests, Ms. Brokenshire asserts, were the basis for Mr. Reed's opinion. (*Id.*). Further, Ms. Brokenshire argues that Mr. Reed even documented what tests were performed and what the tests were used to determine. (*Id.*). Ms. Brokenshire contends that "at the very least," the ALJ had a duty to consider the supportability of Mr. Reed's opinions under the correct legal standard. (*Id.*). Accordingly, Ms. Brokenshire argues that the ALJ failed to comply with the regulation by not considering supportability, and this Court must therefore reverse the ALJ's decision and remand this case for further proceedings. (*Id.*).

### b. The Commissioner's Arguments

The Commissioner asserts that the ALJ reasonably determined that Ms. Brokenshire's physical impairments significantly limited her – such that she could perform on a range of light work – but were not disabling. (ECF Doc. 9, PageID#1455). The Commissioner contends that the ALJ reasonably evaluated Mr. Reed's opinion and appropriately explained why she did not find the physical therapist's opinion persuasive. (ECF Doc. 9, PageID#1455-56). In finding Mr. Reed's

opinion "not persuasive," the Commissioner asserts that "the ALJ stated that Mr. Reed's findings are not consistent with examination findings reported by other providers and that his opinion is not supported by the record, and the ALJ referenced her earlier discussion of the functional capacity evaluation findings and Mr. Reed's proposed limitations." (*Id.* at PageID # 1456  (citing Tr. 37)). The Commissioner also argues that the ALJ's evaluation of Mr. Reed's opinion was further supported by the state agency consultants' prior administrative findings. (*Id.* at 1457 (citing Tr. 92-104, 106-28)). Nonetheless, the Commissioner asserts that the ALJ adopted most of the limitations set forth by the state agency reviewers at the initial and reconsideration levels, yet added more restrictive postural, environmental, and visual limitations based on the totality of the record available at the hearing level, which benefitted Ms. Brokenshire. (*Id.* at 1457-58 (citing Tr. 29-30, 37, 92-104, 106-28). Significantly, the Commissioner argues that both the state agency reviewers considered Mr. Reed's opinion and found it less persuasive because the opinion relied heavily on the subjective reports of symptoms and limitations provided by Ms. Brokenshire, and the totality of the evidence did not support Mr. Reed's opinion. (*Id.* at 1458 (citing Tr. 92-104, 106-28)).

Finally, the Commissioner argues that the Court should not credit Ms. Brokenshire's argument that the ALJ's citation to 20 C.F.R. § 404.1527, rather than 20 C.F.R. § 404.1520c (2017) – which governed the ALJ's analysis of Mr. Reed's findings – prejudiced her disability claim.  (*Id.* at 1458). The Commissioner asserts that the ALJ "clearly applied" 20 C.F.R.  § 404.1520c in discussing supportability and consistency, and in determining the persuasiveness of Mr. Reed's opinion. (*Id.*). Furthermore, the Commissioner states that while a physical therapist is a medical source under the Commissioner's revised regulations and the ALJ appropriately considered the physical therapist medical source's opinion, the ALJ correctly concluded  that physical therapists

are not an acceptable source for diagnostic purposes. (*Id.* at 1459 (citing Tr. 37, 20 C.F.R. §§ 404.1502(a)(1)-(8), 404.1502(d), 404.1520c, 404.1521, POMS DI 24503.015(D)). The Commissioner also contends that the Court should affirm the ALJ's findings because it is supported by substantial evidence. (*Id.*).

## 2. <u>ALJ's Decision</u>

In reviewing Mr. Reed's opinion, the ALJ stated the following:

> The claimant underwent a functional capacity assessment on January 23, 2019 by David Reed, PT, DPT, MS, MBA (Ex. 4F, pp. 37-41). Mr. Reed concluded that the claimant could lift no more than 15 pounds on a non-repetitive basis, stand and walk no more than a combined two hours in an eight hour work day, for no more than 15-20 minutes at a time, sit for no more than 20 minutes at a time, rarely squat, occasionally reach overhead with the left upper extremity, occasionally reach out in front, never bend, or crawl, rarely climb stairs, never climb ladders and occasionally use her hands but not for repetitive activities. While an opinion of a physical therapist is not an acceptable medical source for diagnostic purposes under the regulations, the regulations do recognize them as "other sources" and evidence submitted by them should be considered to determine the severity of the claimant's impairments and how they affect the claimant's ability to work (20 CFR 404.1513, 404.1527). However, the record does not support the extreme degree of limitation found by Mr. Reed. ***As discussed in detail above***, his findings are inconsistent with the claimant's examinations as consistently reported by her numerous providers. Accordingly, the opinion of Mr. Reed is not supported by the overall record and therefore is not persuasive.

(Tr. 37) (emphasis added).

## 3. <u>Analysis</u>

While Ms. Brokenshire correctly argues that the ALJ cited to an outdated regulation, her assertion that this constitutes reversible error is not well-taken. As Ms. Brokenshire asserts and the Commissioner concedes, the ALJ cited an outdated regulation in evaluating the persuasiveness of Mr. Reed's opinion. Specifically, the ALJ cited 20 C.F.R. § 404.1527, stating that, "While an opinion of a physical therapist is not an acceptable medical source for diagnostic purposes under the regulations, the regulations do recognize them as "other sources" and evidence submitted by

them should be considered to determine the severity of the claimant's impairments and how they affect the claimant's ability to work (*20 CFR 404.1513, 404.1527*)." (Tr. 37 (emphasis added)). However, it is undisputed that the regulation the ALJ cited (20 C.F.R. 404.1527) only applies to cases that were filed prior to March 27, 2017. *See* 20 C.F.R. § 404.1520c (2017); 20 C.F.R. § 404.1527. Here, Ms. Brokenshire's claim was filed on March 5, 2019.  Thus, the ALJ was required to evaluate opinion evidence in accordance with 20 C.F.R. § 404.1520c, rather 20 C.F.R. § 404.1527. 20 C.F.R. § 404.1520c.

The Sixth Circuit has recognized that "[i]t is an elemental principle of administrative law that agencies are bound to follow their own regulations." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545 (6th Cir. 2004). "Generally, however, courts review decisions of administrative agencies for harmless error." *Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 654 (6th Cir. 2009)  (citing *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001); *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969) (noting that courts are not required to "convert judicial review of agency action into a ping-pong game" where "remand would be an idle and useless formality.")). Thus, if an agency has failed to adhere to its own procedures, the Sixth Circuit has held that it "will not remand for further administrative proceedings unless "the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." *Id.* at 654-55 (citing *Connor v. United States Civil Serv. Comm'n*, 721 F.2d 1054, 1056 (6th Cir.1983); *see also Am. Farm Lines v. Black Ball Freight Serv.,* 397 U.S. 532, 539 (1970) (holding that agency's failure to follow its own regulations did not require reversal absent a showing of substantial prejudice by the affected party).

Ms. Brokenshire conclusorily asserts that "by simply applying the incorrect legal standard, the ALJ, without even considering Mr. Reed's opinions, diminished the value of his findings."

(ECF Doc. 7, PageID#1431). But Ms. Brokenshire fails to adequately explain why she was prejudiced on the merits or deprived of substantial rights due to the ALJ's citation to an outdated regulation.  She also fails to meaningfully respond to the Commissioner's argument (discussed below) that the ALJ did in fact comply with the current regulations by assessing the opinion's supportability and consistency, as the regulations require. 20 C.F.R. § 404.1520c

While the Sixth Circuit has not addressed whether it is harmless to cite an outdated regulation in assessing the persuasiveness of a physical therapist's opinion, district courts within the Sixth Circuit have found harmless error where an ALJ applied an outdated version of a listing in his Step Three analysis. *See, e.g.*, *Pritt v. Comm'r of Soc. Sec.*, No. 1:21-cv-1728, 2022 WL 2135304, at *11-13 (N.D. Ohio June 14, 2022) (finding harmless error where ALJ applied an outdated version of Listing 11.09 because "reading the ALJ's decision as a whole and with common sense, how the ALJ weighed the evidence is apparent"); *Norris v. Comm'r of Soc. Sec.*, No. 20-12054, 2021 WL 4944817, at *10 (E.D. Mich. Oct. 6, 2021) (finding harmless error where ALJ applied outdated version of Listing 11.09 because it is "apparent in the record from the ALJ's specific findings and the medical evidence that, had she applied the correct version of the listing, she necessarily would have found that Norris fails to meet or medically equal Listing 11.09"). Accordingly, I decline to remand on the basis of Ms. Brokenshire's conclusory assertion that "simply applying the incorrect legal standard" amounted to prejudice on the merits or deprivation of substantial rights. A harmless error analysis is therefore appropriate here and is set forth below.

The Commissioner's arguments that the ALJ effectively complied with current SSA regulations is well-taken. Here, although a physical therapist is a medical source under the Commissioner's revised regulations, the ALJ correctly stated that physical therapists are not an acceptable source for diagnostic purposes. *See* 20 C.F.R. § 404.1502(a); 20 C.F.R. § 404.1520c.

19

Next, the ALJ addressed the consistency and supportability of Mr. Reed's opinion. Under the new SSA regulations, "consistency" is defined as "[t]he more consistent a medical opinion[]…is with the evidence from other medical sources and nonmedical sources in the claim…the more persuasive the medical opinions(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(2).

Specifically, the ALJ discussed Mr. Reed's functional capacity evaluation findings elsewhere in her decision. (Tr. 32-33); *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014) (recognizing that the ALJ's analysis may be found throughout the decision). As noted by the ALJ, at a February 4, 2019 neurology follow-up, over a week after Mr. Reed's evaluation, Ms. Brokenshire's neurologist found at that time: "no hand arthritis, no limitation of range of motion in any of her extremities and no lower extremity edema" and "[h]er neurological examination was also normal." (Tr. 33 (citing Tr. 468-70)).[4] Further, the ALJ noted that Ms. Brokenshire's primary care provider, Dr. Salim Hanna, listed normal physical exam findings on May 29, 2019, including normal gait, normal strength, and no atrophy or abnormal movements. (Tr. 33 (citing Tr. 888-91)).

The ALJ also addressed the supportability factor. Supportability is defined as "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion[]…the more persuasive the medical opinions will be." 20 C.F.R. § 404.1520c(c)(1). Here, the ALJ concluded that Mr. Reed's opinion were not "supported by" the overall record. (Tr. 33). Indeed, the evidence cited by the ALJ in her opinion, particularly Ms. Brokenshire's February 2019 and May 2019 evaluations, support the ALJ's conclusion that Ms. Brokenshire's limitations were significantly less than those opined by Mr. Reed. *See*

---

[4] Although the Commissioner cites to other portions of the record that are inconsistent with Mr. Reed's opinions, those records were not cited by the ALJ.  Thus, I decline to rely on those records.

*Paradinovich v. Comm'r of Soc. Sec.*, No. 1:20-cv-0188, 2021 WL 5994043, at *7 (N.D. Ohio Sept. 28, 2021) ("As discussed above, an ALJ is only required to discuss the supportability and consistency of a medical opinion. If the ALJ discusses both of those factors and her discussion is supported by substantial evidence, the Court may not disturb her findings.").  Here, "reading the ALJ's decision as a whole and with common sense," it is apparent that the ALJ assessed the supportability of Mr. Reed's opinion as required by the current SSA regulations. *See Pritt v. Comm'r of Soc. Sec.*, No. 1:21-cv-1728, 2022 WL 2135304, at *11-13 (N.D. Ohio June 14, 2022)

Accordingly, while the ALJ cited to an outdated regulation, the ALJ did in fact comply with the new regulations by assessing the opinion's supportability and consistency, as required by the regulations. 20 C.F.R. § 404.1520c ("The most important factors we consider when we evaluate the persuasiveness of medical opinions or prior administrative medical findings are supportability…and consistency…). Accordingly, I recommend that this Court AFFIRM the Commissioner's final decision.

## VI.     RECOMMENDATION

For the reasons set forth above, I RECOMMEND that the Court AFFIRM the final decision of the Commissioner.

Dated: March 6, 2023

          *s/ Jennifer Dowdell Armstrong*
Jennifer Dowdell Armstrong
United States Magistrate Judge

## VII.    NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

**Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all

parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).